IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OQ CHEMICALS CORPORATION f/k/a OXEA CORPORATION, | § § § § | |
| Plaintiff, | § | Civil Action NO. _____ |
| v. | § § | JURY TRIAL DEMAND |
| TURNER INDUSTRIES GROUP, LLC, | § § § § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

COMES NOW OQ Chemicals Corporation, f/k/a Oxea Corporation, as Plaintiff, complaining of Turner Industries Group, LLC, as Defendant, and would respectfully show this Court the following:

### I

### PARTIES

1. Plaintiff is a corporation organized under the laws of the State of Delaware that has a principal place of business in Houston, Texas and a right to transact business in Texas and does business in, among other places, Dallas County, Texas.

2. Defendant Turner Industries Group, LLC is a limited liability company organized under the laws of the State of Louisiana with its principal place of business in Baton Rouge, Louisiana. The members and managers of Defendant Turner Industries Group, LLC are individuals Thomas H. Turner, Mary M. Svendson, Robert L. Turner, John G. Turner, James P. Sylvester, Stephen M. Toups, and Suzanne Turner. These individuals are all citizens of Louisiana. Defendant Turner Industries Group, LLC can be served with process by and through its registered agent John H. Fenner at 8687 United Plaza Blvd., Baton Rouge, Louisiana 70809-7009.

II

**JURISDICTION AND VENUE**

Jurisdiction is proper before this United States District Court under 28 U.S.C. Section 1332(a) as the parties are completely diverse and the amount in controversy exceeds the sum of $75,000 (exclusive of interest and costs). Venue is proper in Dallas, Texas based upon the content of the signed, written Services Agreement discussed below which provides, among other things, that "[A]ny suit brought by either party against the other party for claims arising out of this Agreement shall be brought in any court of competent jurisdiction located in Dallas, Texas, and the parties hereto consent to the exclusive jurisdiction of such courts in respect to such action or proceeding". Additionally, Defendant continuously and systematically engages and/or engaged in business in Texas, including this judicial district.

III

**RELEVANT BACKGROUND FACTS**

1. This claim relates to an injury sustained by a (now former) employee of Defendant Turner named Lucio Perez, litigation that Mr. Perez and his spouse filed against Oxea Corporation (Cause No. DC-19-15408, in the 162nd District Court of Dallas County, Texas) (referred to below as the "Litigation"), and damages/losses sustained by OQ Chemicals Corporation f/k/a OXEA Corporation as a result of same, and is based upon the content of a written SERVICES AGREEMENT BY AND BETWEEN TURNER INDUSTRIES GROUP, LLC AND OXEA CORPORATION that was made and entered into on July 23, 2018 (the "Services Agreement").

2. Plaintiff herein is a producer of chemicals that are used for the production of high-quality coatings, lubricants, and other products. Plaintiff owns and operates a chemical plant in Bay City, Texas (the "Bay City Plant"). The Bay City Plant includes a unit known as the POX Unit. This POX Unit houses (among other things) a tower known as T-142.

3. In the Litigation Perez alleged that he sustained an injury when he was "suddenly and without warning exposed to a high concentration of hazardous gas (raw syngas)" from an "open flange" at the top of Tower T-142 while attempting to "insert blinds and spacers between the six-inch pipe flanges at the top of the tower".

4. Historically, OXEA shut down the POX Unit for cleaning and maintenance every other year. This cleaning/maintenance process was known as part of a "turnaround project". These turnaround projects typically ran 24 hours a day and often lasted between 30 and 40 days. As part of the turnaround project equipment like Tower T-142 was cleaned, water-washed, and purged with nitrogen. Then boilermakers like Perez would come in and do the blinding on the towers.

5. OXEA hired various contractors to do work at the Bay City Plant during turnaround projects. One of the contractors that it hired to perform work/services for the 2019 Turnaround Project was Defendant Turner.

6. As demonstrated at Exhibit "A", OXEA and Defendant Turner entered into the written Services Agreement on July 23, 2018 that called for Defendant Turner to perform certain services at/for the 2019 Turnaround Project. This Services Agreement included the following key provisions:

> **8. Personnel.** SERVICE COMPANY will be responsible for providing experienced personnel to complete the Services required by OXEA as agreed to by SERVICE COMPANY and OXEA in a timely manner. SERVICE COMPANY will be responsible for providing the agreed upon number of personnel to the OXEA facilities at all times, and *equipped with proper personal protective equipment*…… (emphasis added).
>
> **10. Independent Contractor**
>
> **A)** SERVICE COMPANY will remain an *independent contractor*, and will not be an agent or employee of OXEA… (emphasis added).
>
> **B)** It is expressly understood OXEA *is interested only in results obtained and neither OXEA nor OXEA's representatives will have any authority to exercise direct or indirect control over the manner in which the Service is*

>  *performed, other than the right to order the Service to start or stop or to inspect progress or receive reports……….Any provisions which may appear to give OXEA the right to direct SERVICE COMPANY or its employees as to details of doing the Service herein covered or to exercise a measure of control over the Service shall be deemed to mean that SERVICE COMPANY shall follow the desires of OXEA in the results of the Service only. In all respects, SERVICE COMPANY shall retain and exercise any and all direct, immediate, and/or indirect control over its employees, including any and all terms of employment applicable to such SERVICE COMPANY employees.* (emphasis added).

**16.     Compliance with Laws**

**A)**     In the performance of the Service under this Agreement, SERVICE COMPANY agrees to comply with all applicable federal, state, county, municipal and local laws, statutes, ordinances, orders, codes, rules, and regulations... (See Exhibit "A").

7.     Defendant Turner also received, and agreed to abide by (*and to have its employees abide by*), the content of OXEA's written Site Safety Plan. This Site Safety Plan, which begins on the first page by stating "Work Safely or Not at All There is Always Time to Do It Right", required independent contractors and employees of independent contractors to acknowledge that:

- They have the *responsibility for their safety* as well as the safety of others;

- They *commit to use "Stop Work Authority" if necessary*;

- They recognize that all accidents and injuries are preventable, and *agree to ensure to take all precautions to finish the job safely*;

- They agreed to *"Work Safely or not at all"*;

- They recognize that "There is always time to do it right";

- They recognize that "If it's worth doing, do it better"; and

- They *commit to ensure every worker will go home* to his/her family and friends "*in the same condition* as when" they arrived to work. See Exhibit "B".

8.     This Site Safety Plan also includes the following key additional language:

- Safety is the top priority for the Bay City Site. It is *everyone's responsibility* to *work safely* and to insist that everyone around him or her also work safe;

- Everyone must stay alert to changing conditions and *alter their work efforts if safety is being jeopardized*;

- If an employee recognizes a hazardous condition it is (his/her) *responsibility to enforce* the <u>Stop Work Authority</u> – "Every employee has a *responsibility to refuse to perform a job that is unsafe* and to be alert to *and stop unsafe practices* of their fellow employees";

- Prior to starting work…all workers will attend a site orientation that will review all site-specific health, safety and environmental aspects and Unit specific training to provide an overview of chemicals onsite. "No contractor or sub-contractor will be allowed to perform work on site without an initial orientation";

- Attend Area Safety Councils for site and unit specific trainings. "All contractors are required to have the site trainings and basic plus";

- "Understand the Job Hazard Analysis (JHA's) process before each job is executed: *What could go wrong? What can I do to prevent an incident? Can I do the job safely?"*;

- "Daily safety meeting will be held as a department or each craft level at the beginning of each job and each shift"; and

- A "Safe Work Permit" is a "*tool to be used* by equipment owners and personnel working on that equipment to identify potential hazards and the means to eliminate or minimize those hazards prior to starting work". See Exhibit "B".

9. Importantly, each contractor working at a turnaround project was required to have its own safety person on site. A representative of Defendant Turner was expected to walk through these steps with OXEA, and OXEA viewed this walk-through as a "joint venture" whereby Turner was responsible for confirming that these steps had been done. Additionally, each contractor was also expected to have its own safety policies and to make its employees aware of hazards that existed in a given work area.

10. It is undisputed that Perez was employed by Turner on the date of the accident at issue. It is also undisputed that:

- Boilermakers employed by Turner were tasked with installing blinds near the top of T-142 (and other towers) during the 2019 turnaround project;

- Oxea was not certified to install blinds itself;

- Perez was sent by Turner's team leader to begin work on the date of the incident at issue;

- A Turner Supervisor signed off on the Safe Work Permit discussed below before Perez began work on T-142;

- A Turner Supervisor named Frank Garza told Perez and his co-workers to blind T-142;

- If the Supervisor at Turner wanted Turner employees to use extra respiratory protection the Supervisor could have instructed them to do so;

- Contractors like Turner are expected to bring their own respiratory protection to the job site;

- The Turner Supervisors were the ones who gave the boilermakers, including Perez, the work to be done by them each day;

- The equipment that the Turner boilermakers took with them on T-142 to work was equipment owned by Turner;

- Turner Foreman Frank Garza gave Perez and his co-worker the Safe Work Permit (upon his receipt of it from OXEA) and told them "This is the blind, need to open it, put the blind.";

- Turner's Supervisors were responsible for determining appropriate procedures and safeguards needed for its employees to work safely;

- Turner Supervisors decided where its boilermakers, including Perez, were to work in the POX Unit;

- The personal protective equipment (PPE) worn and to be worn by Perez consisted of his own and that provided by Turner; and

- OXEA DID NOT TELL TURNER'S EMPLOYEES (INCLUDING PEREZ) HOW THE WORK TO BE PERFORMED BY THEM WAS TO BE PERFORMED.

11. The OXEA employee who sniffed T-142 was Robert Zemanek. Zemanek has described the sniffing procedure that he engaged in as getting readings from bleed valves at various places located on a tower to "catch samples" of what is inside the tower. If/when unacceptable

concentrations of gases are detected during the sniffing process work will "stop" and the tower will be cleaned again.

12. Zemanek sniffed T-142 at 4 different bleed sites and received readings of 0 LEL and 0 Carbon Monoxide. This sniffing was done at (1) overhead piping that leads to another tower (T-153), (2) the bottom where a valve is situated on T-142, (3) a valve situated towards the middle portion of T-142, and (4) somewhere near the bottom of T-153. All sniffing results came back clear, so Zemanek proceeded to issue the Safe Work Permit.

13. The readings that Zemanek received from his sniffing of T-142 are listed in this Safe Work Permit.

14. Zemanek did not state on this Permit that respiratory protection could not be used. Additionally, the need for Emergency Radio Communication was listed (by Zemanek) on this Permit. He also wrote the words "WORK SMART" on this Permit.

15. A Turner Supervisor was supposed to be with Zemanek when Zemanek did the sniffing discussed above. However, this Turner Supervisor (Frank Garza) did not do so. Garza did, however, sign off on this Permit, and Perez and his co-workers were instructed – by Turner Supervisor Garza – to go work on T-142 after Turner completed its own Job Safety Analysis ("JSA").

16. According to Perez, he and one of his co-workers were in the process of opening a flange to plank in and isolate when Perez sensed a "weird smell" and claims to have blacked out. The next thing that Perez remembers is traveling in an ambulance to a medical facility in Matagorda, Texas.

17. IF a Turner Supervisor would have suggested that Perez and his co-workers use respiratory protection they would have done so.

18.     Defendant Turner also had a written Safety Action Plan that Turner prepared specifically for the work it was to do for Oxea. This Safety Action Plan included the following key language:

"**I.     Site Safety and Health Plan**

    **1.0     Objectives**

    **1.1     Safety Objectives**

A successful Safety Program is one that protects life, limb, property, and equipment. The avenue for such is active visible participation in accident prevention by every employee.

    **1.2     Target Goals**

- Achieve an incident and injury free work place.
- Stay in compliance with all OSHA, Company, Client and Industry Regulations at all times.
- **Work together with all personnel and companies to eliminate conditions and actions that could result in any incident.**

    **2.0     Responsibility**

    **2.2     Management Responsibility**

The safety activities of each member of management must be carried on as normal, natural part of supervision. Safety is not separate from or supplemental to, good supervision; it is the heart of good supervision. Each member of management is accountable for the complete fulfillment of responsibility in his area.

    **2.3     Supervisor Responsibility**

The Front-Line Supervisor (FLS)/Foreman is the **key person** in the safety management program, **as they are in constant contact with each worker**. A Supervisor should **never** tolerate an unsafe practice or condition adopted by any worker.

    1.     **To ensure that all employees under his or her direction and shall adhere to all requirements** of the Safety Program, including any additional OSHA and Client requirements.
    2.     **To be involved in the JSA process** and review the JSA of his/her work crew(s) throughout the day to ensure that all unsafe conditions are addressed.

3. **To review the Work Permit on a continuous basis, ensuring they are filled out correctly and complete.**
4. To conduct Toolbox Safety Meetings with all employees under his/her direction prior to start of each shift.
5. **To address, correct, and manage all unsafe conditions and unsafe acts immediately.**
6. **To understand that he/she will be held accountable** for the actions of anyone under his/her direction.

### 2.5 Safety Coordinator

- Participate/manage morning safety meeting
- Present safety reports at meetings
- **Be highly visible to all employees** in and out of the field
- **Facilitate the implementation of the Safety Plan** with all company personnel
- **Interface with all company and contractor employees** and supervision, regardless of company.
- **Take leadership in the Observation and Auditing Processes.**

### 3.0 Training

Safety training of Safety Team members, employees, and contractors shall be conducted to provide knowledge and information to assist people in following all policies and procedures.

#### 3.1 Oxea Site Specifics

Each contractor employee shall receive the required Oxea Site Safety Orientation from the safety council prior to beginning work on the project.

#### 3.2 Turner Specialty Services / Employee Indoctrination

**Each employee will undergo a thorough safety indoctrination, which will include** the policies, procedures, hazards, emergency procedures and minimum safety standards of Turner Specialty Service and Oxea. Specific or **unusual anticipated hazard(s) will be identified and the appropriate safety measures for prevention of each hazard(s) explained and implemented.**

**Training records** will be maintained indicating by signature and date including **important information pertaining** to but not limited to:

- **Personal Protective Equipment/ Hazard Assessment**
- **Hazard Communication**/Material Safety Data Sheets

- **Safe Work Permits** (Including Hot Work, Confined Space)
- **Lock Out/Tag Out**
- **Line Breaking Procedures**
- **Respiratory Protection**

Every effort will be made to make the employee aware that they are the key to a safe job. Task for which they are not trained are uncertain or should not be attempted until employees have received specific instructions as to the safe and proper manner of performance. Turner Specialty Services Management will speak to all employees arriving onto the site.

Site Manager shall conduct a Turner One on One "Commitment 4 Safety" card with each new employee prior to beginning work activities at Oxea.

**All supervisors and foremen will be thoroughly indoctrinated on their specific jobs, Unit Specific Hazards and the steps to be taken to manage these hazards.**

Once an employee has been assigned to a supervisor, additional indoctrination will be conducted to make the employee aware of their specific duties, the area they are working in, and any **specific or unusual hazards in their work, work site, or in the surrounding area.**

### 5.0    Communications

### 5.1.2    Safety Meetings

A. Management/Supervision will conduct a Safety Meeting with all employees at the beginning of each shift throughout the T/A.
B. Each Supervisor/Foremen will also conduct a Safety Meeting before each shift and after each lunch break with his/her crew throughout the T/A.
C. **The material discussed will pertain specifically to the work that each crew is doing.**

### 5.1.3    Tool Box Safety Meeting Guidelines

A. "Tool Box" safety meeting shall be held daily by the Foreman/FLS with all their team members. Issues and audit findings will be discussed from the previous day shall be stressed.
B. The Job Safety Analysis (JSA) will be used as the basis for this meeting.

        C.      Making a safety meeting effective is most important. Plan the subject matter to ensure that it is pertinent. **Identify the risks associated with the job and then plan to manage the risks.**

**5.2**      **Hazard Communication**

Commonly referred to as the "Right to Know" Standard, this federally regulated standard mandates that **employees have the right to know about the hazards they are exposed to** in the workplace.

II.      <u>**Hazard Assessment:**</u>

**1.0**      **Work Permits:**

- **The work permit, "Acceptor" & "Issuer" SHARE responsibilities of ensuring that the work permit is filled out completely and correctly.**

**2.0**      **Job Safety Analysis:**

- The Supervisor/Foreman and all employees in the work crew must participate in the completion or the Job Safety Analysis (JSA) before beginning any work.
- **The JSA is the "first line of defense" for ensuring a job is being completed in a safe manner.**

**12.0**    **Lock-out Tag out Requirements "Control of Hazardous Energy":**

- LOTO is defined as a permitted task that will involve hazardous energy, contained by an isolation device, which is in place to protect workers. *Units on the turnaround will be down and isolated at the normal unit isolation points as identified in the Shutdown procedures.*
- When a permit is issued, the permit issuer will inform the acceptor if the job is a LOTO job or not.
- A Joint jobsite visit will be required for LOTO permits.
- During the Turnaround, the *Designated servicing group/craft representative/ crew members* will place departmental and personal locks on the appropriate lock box that is designated by Oxea Operations for the LOTO.

**13.0    Minimum P.P.E. Requirements:**

- **Respirators shall be used when required**. All provisions of the Turner Respiratory Protection Program will be adhered to.

**7.0    Tell Me Program**

The **"TELL ME"** program will be a part of the overall Safety and Health Process at each job. This program is intended to reduce incident potential in the work environment through active employee involvement and raising employee safety awareness through Intervention, Interaction, Instruction, and Involvement.

Every effort will be made to make the employee aware that they are the key to a safe job. Task for which they are not trained or are uncertain should not be attempted until employees have received specific instructions as to the safe and proper manner of performance.

**All supervisors and foremen will be thoroughly indoctrinated on their specific jobs and possible unit hazards and the steps to be taken to manage these hazards.**

Once an employee has been assigned to a supervisor, additional indoctrinations will be conducted to make the employee aware of their specific duties, the area they are working in, and **any specific or unusual hazards in their work, work site, or in the surrounding area.** Emergency procedures, emergency signals, and evacuation routes will be explained. Emergency equipment will be located and explained.

Adequate documentation of the date and content of all indoctrinations shall be maintained at the job site.

**IV.    *SITE ACCIDENT PREVENTION PROGRAM***

Turner Specialty Services has established this Site Accident Prevention Program to provide its management, employees, subcontractors, and client with a firm understanding of Turner Specialty Services position regarding the prevention of all accidents.

Turner Specialty Services has a primary concern for the safety and health of its employees, not only relating to personal injury/illness. Our commitment and pro- active approach reaches from safety and health, to the maintenance of efficient costs, schedules and quality of the finished work product, without jeopardizing the safety and health of personnel, the general public and/or affecting the property and/or equipment, including the future unit operations.

> Turner Specialty Services will interface with Oxea personnel and other responsible organizations at the Oxea facility to actively promote our commitment to safety and health during all aspects of work effecting personnel on the site.
>
> Turner Specialty Services goal during work activities performed at Oxea is to institute an efficient and productive construction effort that incorporates optimum performance standards for safe work practices, and a strong safety consciousness by all employees, supervisors, subcontractors and material suppliers, **without exception!**
>
> Turner Specialty Services firmly believes that all accidents are preventable and that Safety and Health cannot be viewed as simply a "Priority", but rather as a "Value" that is constant in our daily activities.
>
> **Safety** *is everyone's business! Management, employees, client, subcontractors and suppliers working together to create an "Accident Free Work Site"!* See Exhibit "D".

19. Records obtained from Defendant Turner before this Complaint was filed evidence all of the following:

- Turner Foreman Garza DID conduct a JSA on the date of the incident and considered, but did not choose to require, the use of any respiratory PPE for the work to be done;

- During the course of this JSA Garza noted that one of the job steps to be taken for this work involved "LOTO" (lock out tag out) and that a hazard associated with this work was "Accidental Energy Release". However, the only hazard that he identified for installation of spacers was "Backstrains from heavy lifting";

- Garza went on to document that there was not a need to increase the level of PPE;

- Garza and his crew, which included Perez, also signed off on a "Line Break Checklist" that specifically states that "A jobsite walk down and permit review shall be performed with Operations, Foreman & Mechanics before any work takes place" and that "Permits for the job shall be signed only after walk down and permit review takes place";

- In this Checklist it was noted that the line/equipment (to be worked on) contained "steam/Syngas", that all hazardous material lines must be "blanked, blinded, or double block and vented to prevent release of hazardous material", and confirmed that all drains and bleeder valves were clear and open AFTER A VISUAL INSPECTION WAS PERFORMED. Garza also noted (on this Checklist) that he had properly selected and inspected the PPE; and

- Garza himself completed a written Incident Investigation Report acknowledging that he gave directions for the assigned work (at issue) to Perez and his co-workers and that the above-referenced JSA was completed (by him) properly.

20. Defendant Turner was expected and required to be an active participant in the safe work practices to be followed by Turner's employees, including Perez and his co-workers. While OXEA was responsible for cleaning, purging, and sniffing Tower T-142, and while an OXEA employee was the one who issued the Safe Work Permit after these things were done, it was Defendant Turner who (through its Supervisor) was expected to (among other things) (1) make Turner employees aware of "any specific or unusual hazards in their work, work site, or in the surrounding area", (2) "Identify the risks associated with the job and then plan to manage the risks", (3) ensure that Safe Work Permits are "filled out correctly and (are) complete", (4) "SHARE responsibilities of ensuring" that these Permits are "filled out completely and correctly", (5) actively participate in the completion of the JSA "BEFORE BEGINNING ANY WORK" with the (acknowledged) understanding that these JSA's are the "first line of defense" for "ensuring a job is being completed in a safe manner", (6) participate in a "Joint jobsite visit" for LOTO permits, (7) to provide Supervisors and foreman who were "thoroughly indoctrinated on their specific jobs and possible unit hazards and the steps to be taken to manage these hazards", and (8) exercise Stop Work Authority when applicable.

21. Turner Foreman Garza did not participate in a "jobsite walk down" with OXEA EVEN THOUGH TURNER REQUIRED THAT THIS BE DONE "BEFORE ANY WORK TAKES PLACE" AND BEFORE A TURNER SUPERVISOR WAS TO SIGN THE SAFE WORK PERMIT. Additionally, while Garza DID identify "Accidental Energy Release" as a hazard associated with the LOTO work to be done on the day of the incident he failed to recognize/document this as a hazard associated with the installation of spacers, noting the only

hazard to be "Backstrains from heavy lifting". Without doubt Garza knew that the line/equipment to be worked on contained Syngas. In fact, he noted that certain steps needed to be taken to "PREVENT RELEASE OF HAZARDOUS MATERIAL", reported that all <u>drains and bleeder valves were clear and open</u> AFTER *ALLEGEDLY* CONDUCTING A VISUAL INSPECTION, AND <u>PROCEEDED TO NOTE THAT HE HAD PROPERLY SELECTED</u> AND <u>INSPECTED THE PPE</u>. He also noted, in writing, that he had completed the written JSA (discussed above) "<u>properly</u>", and he did not exercise Stop Work Authority.

22. In Litigation Perez argued that ADDITIONAL PPE (respiratory protection) should have been noted on the Safe Work Permit. However, Turner's Foreman affirmed, by way of his actions (and *alleged* actions) and conduct that this type of PPE was NOT needed (in his opinion, as a Turner supervisor, acting as the "last line of defense" for ensuring that the job would be completed in a safe manner) BEFORE HE SIGNED OFF ON THE SAFE WORK PERMIT and when he let Perez and his co-workers do the work that they did at the top of T-142 on the date/time of the incident.

23. The Services Agreement clearly and conspicuously sets forth certain indemnity obligations of Turner. Specifically, Section 14 of the Services Agreement reads as follows:

    A) SERVICE COMPANY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS OXEA, ITS OFFICERS, AGENTS, EMPLOYEES, AFFILIATES AND PARENTS (EACH AN "INDEMNIFIED PARTY") FROM ANY AND ALL CLAIMS, LIABILITY, LOSS, DAMAGE, COST AND EXPENSE (COLLECTIVELY, "CLAIMS") FOR DAMAGE TO PROPERTY AND FOR DEATII, DAMAGE OR INJURY TO PERSONS, WHOMSOEVER, DIRECTLY CAUSED BY, ARISING FROM, THE NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM OF SERVICE COMPANY, UNDER THE TERMS OF THIS AGREEMENT; INCLUDING, BUT NOT LIMITED TO, DAMAGE TO PROPERTY AND FOR DEATH, DAMAGE OR INJURY TO OFFICERS, AGENTS, EMPLOYEES, SUBCONIRACTORS OR AFFILIATES OF SERVICE COMPANY, UNLESS CAUSED BY OXEA'S NEGLIGENCE OR ANY TIIIRD PARTY NOT UNDER THE CONTROL OF SERVICE COMPANY .. THIS INDEMNITY PROVISION ALSO INCLUDES, BUT IS NOT LIMITED TO, LOSS OF CONSORTIUM, COMFORT, COMPANIONSHIP OR SERVICES, AND CLAIMS FOR MEDICAL OR OTHER EXPENSES. THIS INDEMNITY PROTECTION SHALL INCLUDE ALL REASONABLE COSTS OF LITIGATION,

                INCLUDING REASONABLE ATTORNEYS' FEES, AND THE PAYMENT OF ANY DAMAGES REQUIRED PURSUANT TO THE INDEMNITY OBLIGATIONS HEREIN DESCRIBED, WHETHER BY WAY OF JUDGMENT OR SETTLEMENT.

    B)    FOR TIIE PURPOSE OF THIS PROVISION, ALL ACTIVITIES OF SERVICE COMPANY, ITS EMPLOYEES, AGENTS, OR SUBCONTRACTORS, ON OR ABOUT OXEA'S PREMISES SHALL BE DEEMED TO RELATE TO THE PERFORMANCE OF WORK HEREUNDER, WHETIIBR OR NOT SUCH ACTIVITIES ARE WITHIN THE SCOPE OF THEIR AGENCY OR EMPLOYMENT. See Exhibit "A".

24. Documents and testimony obtained during the Litigation demonstrate that Turner negligently performed under the terms of the Services Agreement, as illustrated above. Accordingly, Turner is contractually obligated to indemnify Plaintiff herein for all loss, damage, cost and expense incurred as a result of Turner's negligence. This includes, but is not limited to, all reasonable costs of litigation (including all reasonable attorney's fees) which collectively exceed the sum of $415,000 and the payment of damages made by Oxea to resolve and settle the Litigation.

25. On November 18, 2022 Plaintiff tendered written correspondence to Defendant demanding that Defendant unconditionally agree to indemnify Plaintiff (as obligated) for all loss, damage, cost and expense incurred as a result of Defendant's negligence pertaining to the Litigation. As of the date of the filing of this Complaint, this demand has been substantially ignored.

**IV.**

**CAUSE OF ACTION COUNT ONE: BREACH OF CONTRACT**

26. Plaintiff realleges and incorporates the facts and allegations set forth above in support of this Count One.

27. As detailed above, and as demonstrated at Exhibit "A", there is a valid, enforceable contract between OXEA Corporation and Defendant Turner.

28. Plaintiff is a party to this contract, and is a proper party to assert this claim for breach of contract.

29. Plaintiff performed under the terms of this contract as obligated.

30. By failing and/or refusing to agree to indemnify Plaintiff as demanded and obligated under the terms of the contract Defendant Turner has materially breached this contact.

31. Defendant Turner's breach has proximately caused economic injury to Plaintiff, for which it now sues.

## V.

### CAUSE OF ACTION COUNT TWO: DECLARATORY JUDGMENT

32. Plaintiff realleges and incorporates the facts and allegations set forth above in support of this Count Two.

33. This second cause of action is one for declaratory relief that is being asserted pursuant to 28 U.S.C. Section 2201 and/or 2202 (the Declaratory Judgment Act).

34. A declaratory judgment in this action will clarify and settle the legal relations between the parties and provide relief from the controversy at issue in this dispute.

35. This Court has the power to hear this request for relief because this case is otherwise within the Court's subject-matter jurisdiction and involves an actual controversy. As demonstrated above, there is an actual, substantial controversy between the parties.

36. Accordingly, Plaintiff asks that, upon hearing, this Court find and declare that the Services Agreement at issue is a valid, enforceable agreement and that Defendant Turner has a binding contractual obligation/duty to indemnify Plaintiff from and for all loss, damage, cost and expense incurred by Plaintiff in the Perez Litigation as a result of Turner's negligence.

## VI.

### ATTORNEY'S FEES

37. Plaintiff realleges and incorporates the facts and allegations set forth above herein.

38. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and/or applicable law, Plaintiff is entitled to recover its reasonable and necessary attorney's fees, and seeks recovery of same herein.

## VII.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court award a judgment in its favor and against Defendant for:

a. All of the relief requested herein;

b. Pre-judgment and post judgment interest;

c. All taxable costs of court; and

d. All other relief to which Plaintiff shows itself to be justly entitled.

Respectfully submitted,

**FEE, SMITH & SHARP L.L.P.**

*/s/ HOWARD J. KLATSKY*
**HOWARD J. KLATSKY**
State Bar No. 00786024
hklatsky@feesmith.com
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
(972) 934-9100
(972) 934-9200 [Fax]

**ATTORNEY FOR PLAINTIFF**